**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

**CALVIN REGISTER,**

      Plaintiff,

v.                                                                     Civil Action No. 7:13-CV-9 (HL)

**CLEAVER-BROOKS, INC.**,

      Defendant.

## ORDER

Before the Court is the Motion for Summary Judgment (Doc. 21) filed by Defendant Cleaver-Brooks, Inc. ("Cleaver-Brooks"). For the reasons stated below, Cleaver-Brooks's motion is granted.

## I.  Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving

party. Id. at 254-55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; *see also* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the opposing party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. *See* Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, under Local Rule 56, the facts listed in the movant's statement of material facts will be deemed admitted as undisputed unless the non-movant denies each specific fact and provides a supporting citation to the factual record. M.D. Ga. L.R. 56.

## II.     Factual Background[1]

This case arises from the termination of Plaintiff Calvin Register's ("Plaintiff") employment with Cleaver-Brooks on August 24, 2011. Cleaver-Brooks develops, manufactures, and distributes packaged boiler systems for commercial and industrial use. The company has operations throughout the United States, including in Thomasville, Georgia where Plaintiff worked. As of July 1, 2010, Cleaver-Brooks employed 173 individuals in Thomasville, with 105 of those employees being Caucasian and 60 employees being African American. (Defendant's Statement of Material Facts ("DSMF"), Doc. 22, ¶¶2-3, 5).

Plaintiff, who is African American, began working as a material handler at the Cleaver-Brooks facility in Thomasville, Georgia in May 2008 and continued in that hourly-wage position until he was discharged in 2011. As of June 2011, the Thomasville operation employed seven material handlers. In addition to his duties as a material handler, Plaintiff was expected to operate cranes and assist in loading and unloading trucks. During his last year at Cleaver-Brooks, Plaintiff's supervisor was Steve Marcum ("Marcum"), but he also took orders from his cell leader, Tony Porter ("Porter"). (Id. at ¶¶7-8, 35; Plaintiff's Statement of Disputed Material Facts ("PSMF"), Doc. 29, ¶¶76, 79, 83, 115).

---

[1] Because Plaintiff Calvin Register does not contest Cleaver-Brooks's motion for summary judgment with regard to his disability discrimination claim, this Order will not touch on facts dealing with his alleged disability.

Under the drug policy that was in effect in 2011, Cleaver-Brooks might test employees for drugs after a reportable accident, after a work-related injury, based on reasonable suspicion, or randomly. (DMSF, ¶12; Declaration of William Lawing, Doc. 34, ¶2; Cleaver-Brooks Drug & Alcohol Abuse Policy, Ex. G to Lawing Declar., Doc. 34-1, pp. 2-3). Plaintiff was tested for drugs on three occasions, once after an accident, once after a workplace injury, and once randomly in 2011. He passed each test. Two white material handlers also had workplace accidents, and both were tested for drugs within days of their accidents. (DMSF, ¶¶15-20; Deposition of Plaintiff, Doc. 38, pp. 41-43). The plant manager, who is white, was randomly tested for drugs three times while Plaintiff worked for Cleaver-Brooks. (Declaration of Dennis Hettinger, Doc. 24, ¶11).

Although Plaintiff was disciplined on various occasions during his employment, this history was not a factor in Cleaver-Brooks's decision to fire him. He was written up several times for tardiness during his time at Cleaver-Brooks. In October 2009, he received a warning for perceived insubordination, failure to follow orders, and damage to property. Plaintiff also received a three-day suspension in April 2010 for failing to follow inventory instructions. (Plaintiff Depo., pp. 50-64, 94-96; Disciplinary Record, Ex. 10 to Plaintiff Depo., Doc. 50-3). According to Cleaver-Brooks's disciplinary policy, each warning only remained "active for a period of twelve (12) months." (Cleaver-Brooks

Disciplinary Procedures, Plaintiff's Ex. 8 in Opposition to Summary Judgment, Doc. 28-8, p. 1). Cleaver-Brooks terminated Plaintiff's employment based on the events of August 24, 2011, not on his disciplinary history. (Deposition of William Lawing, Doc. 43, pp. 21-22).

When Cleaver-Brooks first hired Plaintiff, it started him at a lower hourly rate than was given to two white material handlers, Milton "Derrick" Bracewell ("Bracewell") and Donald Boyd ("Boyd"), who were hired around the same time. (DSMF, ¶¶33-35, 41). When the company hires a new material handler, his supervisor, the materials manager, and the human resources department collaborate in setting the starting pay. Prior work experience is a key factor for setting an employee's starting wage. (PMSF, ¶¶125, 130). When Cleaver-Brooks hired Bracewell and Boyd, it knew that they had previous experience as material handlers and that one of them had been a supervisor. Although Plaintiff had previously worked as a material handler, he did not disclose this on the Cleaver-Brooks application. (DSMF, ¶¶41, 80; PMSF, ¶¶41, 80; Plaintiff's Application, Ex. F to Hettinger Declar., Doc. 24-6).

Just prior to losing his job, Plaintiff was earning a higher hourly rate than some white material handlers, and less than others. (Hettinger Declar., ¶¶14-20; Pay History of Material Handlers, Ex. C. to Hettinger Declar., Doc. 24-3). Cleaver-Brooks employees earn pay raises based on annual performance

reviews as well as merit increases once they earn enough points, through additional training and other means, to move to the next pay grade. (DMSF, ¶¶30-31). As Plaintiff's supervisor, Marcum could recommend pay raises for him, but the plant manager made the final decision on a raise.  Over the course of his employment, Plaintiff received one merit pay increase and three raises in connection with annual performance reviews, with Marcum recommending one raise. (Id. at ¶35; Deposition of Steve Marcum, Doc. 40, pp. 14-15; Lawing Depo., p. 26). Cleaver-Brooks trained Plaintiff in operating forklifts and cranes and never refused to provide him with additional training, although there is no evidence he ever explicitly requested it. Conversely, Boyd requested and received training in loading plate. Marcum did suggest that Bracewell be trained in shipping, although he did not make a similar suggestion to Plaintiff. (Id. at 22-24; PSMF, ¶¶79, 98; DMSF, ¶11).

In the late spring of 2011, Plaintiff overheard Bracewell and another employee, Steve Chastain ("Chastain"), discussing their recent pay raises. Plaintiff did not know their hourly wages. Approximately two months later, assuming Chastain and Bracewell were making more money than he was since he had not received a pay raise, Plaintiff spoke with Marcum about the presumed pay disparity. He never claimed the difference was because of his race. Marcum told him how much the other employees were paid was none of his business.

However, Marcum brought Plaintiff's concerns to Nora Wallace ("Wallace"), Marcum's superior and the then-material manager at the Thomasville facility, and told her Plaintiff said he was being paid less because of his race.[2] Wallace never did anything to address Plaintiff's pay after his complaint to Marcum. (Id. at ¶¶28-39; PSMF, ¶36, 38; Marcum Depo., pp. 14-17).

Other African American employees also perceived a pay disparity based on race. (*See* Deposition of Hiram Jackson, Doc. 48, pp. 8-10; Deposition of Terri McCall/Jones, Doc. 46, pp. 16-19; Deposition of Rufus Russ/Harper, Doc. 45, pp. 9-11). When Boyd received a merit pay increase and Felisa Hines, a black material handler, did not, Hines told Wallace she thought she was receiving less favorable treatment because of her race. Wallace said she would investigate the matter, but she never discussed the issue with Hines again. (Deposition of Felisa Hines, Doc. 47, pp. 9-11).[3]

After Marcum joined Cleaver-Brooks in August 2010 as a supervisor in the materials department, he did not get along well with some of the African American employees. Marcum supervised approximately fourteen employees.

---

[2] The nature of Plaintiff's pay complaint is rather murky. During Plaintiff's deposition, he unequivocally testified that he did not tell Marcum he was paid less because of his race. (Plaintiff Depo., pp. 89-90). However, Marcum just as clearly testified that Plaintiff's complaints were race-related and that Marcum had mentioned this to Wallace. (Marcum Depo., pp. 15-16). She, in turn, denied ever learning that Plaintiff claimed to be suffering racial discrimination in regards to his pay. (Deposition of Nora Wallace, Doc. 41, pp. 11-13). As will be seen below, whether Plaintiff did or did not mention race to Marcum does not affect the outcome of this case.

[3] The title of Hines's deposition incorrectly lists her name as "Katrina Hines."

When Marcum first started working at Cleaver-Brooks, he did not talk to black employees very much and never socialized with them. The supervisor excluded Plaintiff from conversations and never shook his hand, although he did shake hands with white employees. He appeared to prefer working with white employees rather than with African American employees. (PMSF, ¶¶114, 119-20). Some of the white employees working under Marcum received recognition for perfect attendance despite absences from work, whereas black employees who left work early were questioned. (McCall/Jones Depo., pp. 10-11, 22-23).

The events leading to Plaintiff's termination began on the morning of August 24, 2011. After Plaintiff started work at 6 a.m., his cell leader Tony Porter provided him with a list of parts to collect for production because assembly employees were waiting on the parts. The parts were stored in different buildings spread across Cleaver-Brooks's plant. Plaintiff began collecting the parts with a forklift, but he could not work very quickly because some of the parts were heavy. (PMSF, ¶134).

While Plaintiff was pulling the parts on his list, he received a radio call from Doug Peek ("Peek"), another material handler, asking for help unloading a truck driven by Emory Lutes ("Lutes"), who worked for one of Cleaver-Brooks's suppliers. Plaintiff told Peek he would help unload the truck once he had completed his list. Material handlers are expected to give higher priority to pulling

parts for production than to unloading delivery trucks. About a minute after Plaintiff spoke with Peek, Marcum radioed Plaintiff and told him to assist Peek with unloading the truck. Plaintiff explained that he had been given a production assignment by Porter and that other employees were waiting for the parts on his list. Marcum told him to quickly finish the list so he could help with the truck. (Id. at ¶¶133, 135, 137).

About fifteen minutes later, Marcum called a second time because Plaintiff was still working on the parts list. The supervisor said, "Calvin, ain't you through with that pick list yet?" When Plaintiff said he was not yet done, Marcum replied, "Hurry up and get around here." Plaintiff said he would be there as soon as he had pulled the parts on his list. He also told Marcum, "You don't have to talk to me that way. You're not my daddy, you're just my supervisor." Marcum's rejoinder was that "When you get around here, we'll talk about this." (Id. at ¶138). Because Marcum and Plaintiff were talking on their work radios, several other employees overheard the exchange. A number of them thought that Marcum had spoken to Plaintiff in a rude, disrespectful manner, although several also thought that Plaintiff's response was inappropriate. (Id. at ¶¶142-46; Deposition of Robert Jackson, Doc. 39, pp. 26-27; Declaration of David Dennis, Doc. 26, ¶¶2-7).

Once Plaintiff finished collecting the parts on his list, he drove his forklift to where Peeks was unloading the delivery truck. Plaintiff drove at a normal speed

with the forks two to three inches above the ground, which was proper. When Plaintiff reached the area where the truck was being unloaded, he braked to a stop and then dropped the forks all the way to the ground. The forklift did not skid or slide. Peek and another material handler named Logan[4] were unloading the truck, while Marcum and Lutes were standing nearby watching them. Plaintiff stopped the forklift about fifteen feet from where Lutes was standing. (PMSF, ¶¶149-52).

When Plaintiff stepped down from the forklift, he approached Marcum and said, in normal tones, that he had gotten to the truck as fast as he could. Marcum, with his voice raised, asked, "What the hell is wrong with you today?" When Plaintiff replied that nothing was wrong with him, Marcum said, "I ought to write your ass up for insubordination." Plaintiff responded with "I ain't did nothing." Unsatisfied, Marcum replied, "I'll tell you what, go in there and clock your ass out for the day. You're suspended for the day." At some point during the conversation, Plaintiff said that nobody talks to him like that. (Id. at ¶153).

Plaintiff clocked out of work and then, because it was not yet 8 a.m., waited for William Lawing ("Lawing") to arrive. Lawing was the human resources manager at the Thomasville facility but had only been in that position for four months. Plaintiff briefly described what had happened with Marcum and asked

---

[4] The second material handler had only recently begun working at Cleaver-Brooks, and Plaintiff thinks, without being absolutely certain, that his name was Logan. (Plaintiff's Affidavit, Doc. 28-15, ¶29).

whether he was going to be fired. He said Marcum was racist and that the reason Marcum had suspended him was because of his race. (Id. at ¶¶154-56). Plaintiff had never previously complained about experiencing racial discrimination from Marcum. (Plaintiff Depo., pp. 89-90). Lawing replied, "No, no, no, Steve is not like that," but told Plaintiff to wait in his office while he spoke with Marcum. When Lawing returned, he related that Marcum was still angry, and he suggested that Plaintiff go home for the day, wait until 3 or 3:30 in the afternoon, and then call back to apologize to Marcum. Lawing assured Plaintiff he would investigate the incident and Marcum's treatment of minority employees. (PMSF, ¶¶157, 159).

Once Plaintiff went home, Lawing began his investigation. He spoke with the material handlers working under Marcum about whether their supervisor treated African American employees differently on the basis of race. (Lawing Declar., ¶5). Although Lawing claims to have spoken with the material handlers about the incident between Marcum and Plaintiff, at least one material handler denies that he did. (Id.; Hines Depo., pp. 6-8). He also spoke with Marcum again, questioned the individuals who observed the confrontation between Marcum and Plaintiff,[5] and talked with some of the employees who heard their radio conversation. (Lawing Depo., pp. 10-13). Lawing made handwritten notes on his investigation and then prepared a written report. He only included in his report

---

[5] There is no evidence that Lawing spoke with Logan, but there is also no evidence about what Logan knew concerning the confrontation.

the statements that he considered to be relevant. (Lawing Declar., ¶5). Peek, Lutes, and Marcum told Lawing that when Plaintiff approached the delivery truck on the forklift, he was driving at a fast speed towards Lutes. Lutes said he was afraid he would be hit. According to the account provided by Peek, Lutes, and Marcum, Plaintiff had stopped by slamming on his brakes and causing the forklift to skid for ten feet. They all agreed that Plaintiff had been the initial aggressor in the confrontation with Marcum and that his tone had been loud, angry, and insubordinate, while Marcum remained calm. (Declaration of Emory Lutes, Doc. 25, ¶¶2-11; Marcum Depo., pp. 27-29; Deposition of Doug Peek, Doc. 42, pp. 7-10, 13-17; Lawing Investigation Notes and Summary, Plaintiff's Ex. 11-14 in Opposition, Doc. 28-11 through 28-14).

Completing his investigation, Lawing decided that Plaintiff had been insubordinate and unsafe in driving the forklift and that the situation warranted serious discipline. Lawing asked Marcum what discipline he would recommend, and the supervisor suggested either termination or some other serious discipline. Lawing also read through Cleaver-Brooks's disciplinary file on Plaintiff. Marcum had never disciplined Plaintiff prior to that day. After speaking with the manager of the Thomasville facility and the human resources director in Cleaver-Brooks's corporate office, Lawing eventually decided that Plaintiff's termination was necessary. Lawing called Plaintiff about 4:15 or 4:20 on the afternoon of August

24 and told him he was fired, without explaining the reasons for the termination. (Lawing Investigation Summary, Doc. 28-14; Lawing Depo., 16-22; PMSF, ¶¶111, 113, 165, 168-72). Several months later, when Peek inquired about why he was being deposed in this lawsuit, Lawing told him that "it's a black thing." (Peek Depo, pp. 11-12).

Plaintiff brought suit against Cleaver-Brooks in this Court on January 21, 2013. His complaint alleges that the company discriminated against him on the basis of a physical disability and his race and also retaliated against him for reporting unlawful employment practices. More specifically, Plaintiff alleges that he suffered discrimination when Cleaver-Brooks subjected him to multiple drug tests, made him perform additional work, failed to provide assistance from other workers, paid him less than white material handlers, and ultimately fired him. He also contends that he was discharged in retaliation for complaining about his pay and telling Lawing that Marcum was a racist. (Complaint, Doc. 1, Counts I-III).

## III.  Analsysis

The motion for summary judgment must be granted for each of Plaintiff's claims because the undisputed factual record demonstrates that Cleaver-Brooks is entitled to judgment as a matter of law.

## A.     Claims under the Americans with Disabilities Act

The Court grants summary judgment on the claims of disparate treatment and retaliation in violation of the Americans with Disabilities Act. Because Plaintiff has abandoned these claims,[6] the Court need not address them any further.

## B.     Race Discrimination Claim

Summary judgment is also granted on Plaintiff's claim of race discrimination. Title VII of the Civil Rights Act of 1964 prohibits various forms of employment discrimination on the basis of race, including termination of employment or actions affecting an employee's "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). A claim of unlawful disparate treatment may be established either with direct evidence of discrimination or through circumstantial evidence that allows for an inference of discrimination. *See* Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330-31 (11th Cir. 1998). Because Plaintiff restricts his argument opposing summary judgment to circumstantial evidence, the Court need not address the standard for evaluating direct evidence of discrimination.

The Supreme Court has developed a burden-shifting approach for analyzing disparate treatment claims based on circumstantial evidence. Hall v. Ala. Ass'n of Sch. Bds., 326 F.3d 1157, 1165-66 (11th Cir. 2003) (citing

---

[6] *See* Plaintiff's Response and Memorandum in Opposition to Defendant's Motion for Summary Judgment, Doc. 30, p. 2 n. 1.

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). To move forward with his claim, Plaintiff must first establish a *prima facie* case. Id. at 1166. Thus, Plaintiff must show that, (1) as a member of a protected class, he was (2) subjected to an adverse employment action even though (3) he was qualified for his position and (4) Cleaver-Brooks treated similarly-situated employees outside of his class more favorably. Id. With regard to the fourth element, the Eleventh Circuit has recognized that a plaintiff may offer a *prima facie* case even without a similarly-situated comparator if he points to a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011); *see also* Turner v. Fla. Prepaid College Bd., 522 F. App'x 829, 832-33 (11th Cir. 2013) (per curiam).

If Plaintiff presents a *prima facie* case of disparate treatment, then the McDonnell Douglas framework shifts the burden to Cleaver-Brooks "to produce evidence that its action was taken for a legitimate, non-discriminatory reason." Brooks v. Cnty. Com'n of Jefferson Cnty., Ala., 446 F.3d 1160, 1162 (11th Cir. 2006). If the employer proffers a legitimate reason for the action, rebutting the presumption of discrimination, the burden then swings back to Plaintiff to provide sufficient factual evidence to create a genuine issue of fact for whether the

proffered reason was pretextual. Id. at 1162. This Court must dismiss the discrimination claim if Plaintiff does not carry his burden. Id. at 1163-64.

### 1.    Whether Plaintiff has established a *prima facie* case

Although Plaintiff is able to establish the first three elements of a *prima facie* case of disparate treatment, his failure to prove the final element is fatal to his claim that Cleaver-Brooks discriminated against him. Cleaver-Brooks does not dispute that, as an African American, Plaintiff belongs to a protected class. The first element of the *prima facie* case has been met.

Plaintiff has also established the second element. Cleaver-Brooks concedes that Plaintiff's termination was an adverse employment action. Plaintiff also alleges that the company paid him less than similarly-situated white employees. Cleaver-Brooks agrees such treatment would fall under Title VII, but it denies having paid Plaintiff less because of his race.[7] However, Plaintiff has produced evidence that he was paid less than two white material handlers, Boyd and Bracewell, who began working at Cleaver-Brooks around the same time that he did. Thus, Plaintiff's termination and the pay disparity constituted adverse employment actions so far as making out a *prima facie* case for discrimination is

---

[7] This argument is more properly understood as stating that Plaintiff was not similarly situated to the employees in question and will be addressed below in the Court's analysis of that element of the prima facie case.

concerned.[8] *See* <u>Gillis v. Ga. Dep't. of Corr.</u>, 400 F.3d 883, 887-88 (11th Cir. 2005) (noting that race-based disparity in pay violates Title VII).

Considering next whether Plaintiff was a qualified employee, the third element of the *prima facie* case, the Court concludes that he was. Cleaver-Brooks maintains that Plaintiff's disciplinary history and his actions on the day he was terminated demonstrate he was unqualified as a material handler, but this argument is unconvincing. Plaintiff disputes the factual basis for his discipline in October 2009, and his tardiness and failure to follow inventory procedures are not significant enough to suggest he was unqualified. More importantly, Cleaver-Brooks not only continued employing Plaintiff after these incidents but also raised his pay. Plaintiff might not have been an ideal employee, but he was certainly qualified to be a material handler. As for his behavior on August 24, 2011, Plaintiff denies that he drove the forklift unsafely or that he was insubordinate to Marcum.[9] Even if some of his retorts to Marcum might be perceived as

---

[8] Although Plaintiff has asserted other claims of adverse employment action, these claims cannot withstand summary judgment scrutiny. Title VII did not prohibit Cleaver-Brooks from requiring Plaintiff to perform extra work, failing to provide him with adequate assistance from other workers, and subjecting him to drug tests. *See* <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1239 (11th Cir. 2001) ("[T]o prove adverse employment action ... an employee must show a *serious and material* change in the terms, conditions, or privileges of employment ... as viewed by a reasonable person in the circumstances."). These actions did not cause Plaintiff economic harm. *See* <u>id.</u>
[9] Whether Cleaver-Brooks might have had a legitimate basis for thinking Plaintiff had been insubordinate or unsafe is another question entirely.

disrespectful, the Court is unable to find as a matter of law that these comments rendered Plaintiff an unqualified employee.

Turning to the final element of the *prima facie* case for disparate treatment, the Court concludes that Plaintiff has not provided sufficient evidence to create a factual question on discriminatory intent. Plaintiff cannot produce a similarly-situated employee of another race whom Cleaver-Brooks treated more favorably,[10] so he is only left with "present[ing] 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker.'" Lockheed-Martin, 644 F.3d at 1328 (quoting Silverman v. Bd. of Educ. of City of Chicago, 637 F.3d 729, 734 (7th Cir. 2011)). General averments of being treated differently than employees of a different race are insufficient. Turner, 522 F. App'x at 833. "Unless something links the actions to the employee's race, that a decisionmaker singles an employee out does not permit a jury to infer intentional discrimination." Id.; *see also* Bell v. Crowne Mgt., LLC, 844 F. Supp. 2d 1222, 1234 (S.D. Ala. 2012) (noting that if no similarly-situated employee is provided, then "any substitute evidence must be comparably powerful in order to preserve to the prima facie case its gate-keeping function as ordained by the Supreme Court").

---

[10] Plaintiff has conceded this point. (*See* Plaintiff's Response, p. 10).

Plaintiff fails to present a convincing mosaic that would allow a jury to infer the pay disparity was the result of racial discrimination. Plaintiff does not clarify who the decisionmaker was whose alleged animus was responsible for his rate of pay. The record does not provide evidence for who set Plaintiff's initial wage when he was first hired, but it was clearly not Marcum because he began working for Cleaver-Brooks after Plaintiff was already hired. The fact that Plaintiff started at a lower rate than Boyd and Bracewell is not sufficient evidence for a *prima facie* case. Cleaver-Brooks knew the white material handlers had previous relevant work experience without knowing about Plaintiff's work history.

Nor is there evidence Cleaver-Brooks denied Plaintiff a pay raise because of his race. Marcum recommended at least one pay raise for Plaintiff, and there is no evidence from which a jury could reasonably infer Marcum withheld additional recommendations because of Plaintiff's race. There is no evidence that Plaintiff, unlike Boyd, ever requested the cross-training that would have made him eligible for additional pay raises,[11] and there is certainly no evidence that Cleaver-Brooks ever denied such a request. Although Marcum did ask Bracewell if he would be interested in cross-training, there is no evidence Marcum made the same suggestion because of the employee's race. Moreover, the evidence that when Marcum first arrived at Cleaver-Brooks he was more friendly to white

---

[11] Robert Jackson's agreeing that Plaintiff "appear[ed] to be someone who was interested in cross training and making more money" is not evidence that a specific Cleaver-Brooks employee denied training to Plaintiff. (Robert Jackson Depo., p. 15).

employees and did not write some of them up for tardiness has too tenuous a connection to Plaintiff's pay to create a triable issue for whether Marcum denied merited pay raises to Plaintiff because of racial animus.

The evidence is also lacking that any other decisionmaker at Cleaver-Brooks limited Plaintiff's pay because of his race. Several African American employees at Cleaver-Brooks have complained about unfavorable treatment, but when broken down, their testimony provides little more than evidence that employees may have been treated differently because of nepotism, favoritism, or personal animosity. (*See* Russ/Harper Depo., pp. 9-12; McCall/Jones Depo., pp. 16-18; Hines Depo., pp. 9-12). Title VII is not concerned with whether an employment decision was made for a good reason, a bad reason, or no reason at all, so long as it was not an unlawful reason. Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010). Nowhere is there clear evidence of racial animosity from which a reasonable inference could be drawn that such prejudice also infected decisions about Plaintiff's rate of pay. The undisputed evidence is that Plaintiff was paid more than some white material handlers and less than others.

Plaintiff has also failed to present a convincing mosaic of circumstantial evidence from which a jury could reasonably infer that his termination was the result of unlawful discrimination. Lawing was the Cleaver-Brooks employee who

decided Plaintiff's fate, and there is no evidence his decision was animated by racial prejudice. Many months after the decision to fire Plaintiff had been made, Lawing did tell Doug Peek "it's a black thing" in response to Peek's demand to know why he was being deposed in this lawsuit. Lawing denies ever making the comment, and Peek admitted in his deposition he does not know exactly what Lawing meant to convey. (Lawing Declar., ¶8; Peek Depo., pp. 11-12). A reasonable interpretation would be that Lawing was describing the nature of Plaintiff's lawsuit—race discrimination, but even if something more sinister is perceived in the statement, this would hardly be sufficient to create a factual question for whether Cleaver-Brooks fired Plaintiff because of his race. Lawing made the statement well after Plaintiff was fired.

Plaintiff's alternative argument for establishing a *prima facie* case of discriminatory intent for his termination also fails. Plaintiff argues that Lawing was merely the "cat's paw"[12] or conduit for Marcum's invidious intentions. The record, however, does not support the conclusion that Marcum controlled Lawing's investigation and decision. "Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee." Pennington v. City of Huntsville, 261 F.3d 1262, 1270 (11th Cir. 2001). Although Lawing's investigation might not have been perfect, it

---

[12] In *Staub v. Proctor Hospital*, the Supreme Court described the colorful history of this term for employment discrimination cases. ___ U.S. ___, 131 S.Ct. 1186, 1190 n. 1, 179 L.Ed.2d 144 (2011).

was sufficiently thorough and independent to counter any undue influence from Marcum. Lawing spoke with all of the eyewitnesses to the confrontation, and the disinterested witnesses uniformly described Plaintiff as driving unsafely and having a combative, disrespectful attitude. Although Plaintiff claims that Logan was also present at the confrontation, there is no evidence this employee actually saw the incident or what his testimony about it might have been.

Nor is the fact that Lawing only spoke with one employee who overheard the earlier radio exchange between Plaintiff and Marcum particularly troubling. David Dennis, with whom Lawing spoke, described Marcum's tone during the exchange as "forceful" but "not offensive." (Lawing Investigation Notes and Summary, Doc. 28-11, 28-14). Conversely, some African American employees who overheard Marcum have testified that his tone was disrespectful and insulting. (McCall/Jones Depo., pp. 14-15; Hines Depo., pp. 6-7; Hiram Jackson Depo., pp. 6-8; Robert Jackson Depo., pp. 16-17). Regardless, Plaintiff admitted to Lawing he had told Marcum "you're my supervisor, not my daddy," and a reasonable person in Lawing's position might have perceived this remark as disrespectful on its face. Certainly Robert Jackson, the African American who was previously Plaintiff's cell leader at Cleaver-Brooks, did. (Id. at 26-27). The Court is not prepared to decide Lawing's investigation was compromised simply because he decided to terminate Plaintiff for insubordination while allowing

Marcum to be disrespectful towards a subordinate. Tolerating a higher degree of insulting, rude behavior in a supervisor than in a subordinate might be bad policy, but that does not mean it is illegal.

Furthermore, while Lawing did ask Marcum what an appropriate punishment for Plaintiff might be, the record does not indicate Lawing blindly followed the supervisor's recommendation. Plaintiff has not provided evidence to dispute that Lawing spoke with the employees under Marcum's supervision concerning his treatment of racial minorities. Moreover, Lawing checked Plaintiff's disciplinary history and learned that in 2009 Robert Jackson had also perceived him as being insubordinate. Lawing discussed the potential termination with both the plant manager and the human resources officer in Cleaver-Brooks's corporate office before making his final decision. The question for the Court is not whether Plaintiff was, in fact, insubordinate or unsafe but only whether Lawing's decision was sufficiently well-grounded to show it was made independent of Marcum's alleged racial prejudice. The undisputed evidence shows that it was. Therefore, because Plaintiff was lawfully terminated, he has failed to establish a *prima facie* case of disparate treatment.

### 2. Whether Cleaver-Brooks's proffered reasons were non-discriminatory

Assuming Plaintiff could present a *prima facie* case for discrimination, under the McDonnell Douglas framework the burden of production would swing

to Cleaver-Brooks to provide a legitimate, nondiscriminatory reason for Plaintiff's pay and termination. *See* Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012). To satisfy this burden, Cleaver-Brooks "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id. (internal citation and quotation omitted). The company claims that Plaintiff's pay was the result of his perceived experience, annual performance review, and level of training and that he was discharged because of his insubordination and unsafe handling of the forklift. These proffered explanations are legitimate reasons for Cleaver-Brooks's actions, and there is evidence to indicate these were its motivations.

### 3.   Whether Plaintiff has shown the proffered reasons to be pretextual

The burden now swings back to Plaintiff to show that the proffered reasons are pretexts and that Cleaver-Brooks was really motivated by racial prejudice. He could demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence." Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To escape summary judgment, he must provide a reasonable jury with sufficient evidence to decide that Cleaver-Brooks's explanations were not the

real reasons for the adverse actions taken against him. Kragor, 702 F.3d at 1308-09. He has not done so.

Plaintiff has not shown that Cleaver-Brooks's proffered explanation for his rate of pay was a pretext for racial discrimination. His argument suffers from his failure to identify which employees at Cleaver-Brooks decided to pay him less because of his race. Even if the Court were to assume Marcum and Nora Wallace made this decision, there is no evidence to rebut Cleaver-Brooks's proffered explanation for Plaintiff's pay. Although Plaintiff tries to gain traction by arguing that he had as much prior experience as Boyd and Bracewell, who started at a higher pay, there is no evidence that Cleaver-Brooks was aware of his qualifications. Nor is there evidence Plaintiff had ever worked as a supervisor, as at least one of the white employees had. Moreover, the record reveals that Cleaver-Brooks raised Plaintiff's pay on multiple occasions, never denied a request that he receive the cross-training that would have made him eligible for additional raises, and paid him a higher wage than some white material handlers received. Although Marcum did suggest that Bracewell receive additional training, there is no evidence that he made similar suggestions to other white employees or that race was a factor.

Plaintiff is equally unconvincing in arguing that Cleaver-Brooks's explanation for why it fired him is pretextual. There is no evidence that Lawing

made the decision to terminate Plaintiff's employment because of racial animus. Lawing's comment that "it's a black thing" was ambiguous, to say the least, but more importantly it was made several months after Plaintiff was fired. Regardless of whether Plaintiff was, in fact, insubordinate or unsafe in handling the forklift, Cleaver-Brooks had a solid basis for concluding he had been. Plaintiff has failed to create a triable issue on whether the proffered explanation for his dismissal was really a smokescreen for racial discrimination.

Cleaver-Brooks's motion for summary judgment on the disparate treatment claim is granted. Plaintiff has failed to present a *prima facie* case under Title VII. Even if he had met this burden, he has not provided sufficient evidence to cast doubt on Cleaver-Brooks's proffered reasons for firing him.

### C.    Retaliation Claim

Cleaver-Brooks is also entitled to judgment as a matter of law on Plaintiff's retaliation claim. It is unlawful for an employer to retaliate against an employee for opposing a practice that is prohibited by Title VII. Adams v. Cobb Cnty. Sch. Dist., 242 F. App'x 616, 620 (11th Cir. 2007) (quoting 42 U.S.C. § 2000e-3(a)). A Title VII retaliation claim based solely on circumstantial evidence is analyzed under the same McDonnell Douglas burden-shifting framework described above in Part III(B).[13] Id.; Johnson v. Booker T. Washington Serv., Inc., 234 F.3d 501,

---

[13] As with the disparate treatment claim, Plaintiff does not assert that there is direct evidence of retaliation.

507 n. 6 (11th Cir. 2007). To establish a *prima facie* retaliation claim, Plaintiff must show "that (1) [he] engaged in statutorily protected conduct; (2) [he] suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action." Brungart v. Bellsouth Telecomms., Inc., 231 F.3d 791, 798 (11th Cir. 2000) (citing various cases, including Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) with regards to Title VII). Plaintiff alleges that Cleaver-Brooks fired him because of his complaints to Marcum of pay disparity in April 2011 and/or his relating to Lawing on August 24, 2011 that Marcum was racist. However, neither claim is sufficient to pass summary judgment muster.

Plaintiff has not made out a *prima facie* case for retaliation in relation to his complaints of pay disparity. Even assuming Plaintiff actually conveyed to Marcum his belief that he was being paid less because of his race, despite the fact that Plaintiff testified that he did not make a race-based complaint, there is no causal connection between this complaint and Plaintiff's termination. Plaintiff has not shown, as he is required to do, that Lawing was aware of the pay complaints when the termination decision was made. *See* Brungart, 231 F.3d at 799. Plaintiff's argument that Lawing merely served as Marcum's "cat's paw" has already been considered and rejected.  Thus, the claim that Plaintiff suffered retaliation for complaining about his pay is dismissed.

Plaintiff's claim that Cleaver-Brooks retaliated against him for telling Lawing that Marcum was racist must also be dismissed. The Court will assume for purposes of analyzing Plaintiff's claim that he could establish a *prima facie* case. Having already concluded that Cleaver-Brooks's proffered explanations for terminating Plaintiff's employment were lawful, the Court will now consider whether they are only pretexts for retaliation. At this stage of the McDonnell Douglas analysis, the close temporal proximity between Plaintiff telling Lawing about Marcum's supposed racism and the termination is of no consequence. *See* Raspanti v. Four Amigos Travel, Inc., 266 F. App'x 820, 823 (11th Cir. 2008) (per curiam). Because Cleaver-Brooks's proffered reasons for firing Plaintiff—he was insubordinate and unsafe—were ones "that might motivate a reasonable employer, [he] must meet that reason head on and rebut it." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). He could do so "either directly by persuading the court that a discriminatory reason more likely motivated [Cleaver-Brooks] or indirectly by showing that [its] proffered reason is unworthy of credence." Burdine, 450 U.S. at 256.

Plaintiff has not shown that a discriminatory motive more likely motivated Lawing, the decisionmaker for Cleaver-Brooks, than his own explanations for discharging Plaintiff. There is no evidence that Cleaver-Brooks fabricated or staged Plaintiff's confrontation with Marcum on August 24, 2011. *See* Raspanti,

266 F. App'x at 824 (concluding that the employee had not established pretext because "she did not present evidence that the company fabricated" the reason for her discharge or "treated her differently from similarly situated employees"). Plaintiff strenuously denies that he was insubordinate to Marcum or that he endangered anyone with the forklift, but this does not create a triable issue of fact on the retaliation claim. The question for this Court is whether Lawing "genuinely believed that [Plaintiff] had, in fact," been insubordinate and unsafe and dismissed him for those reasons. Mealing v. Ga. Dept. of Juvenile Justice, ___ F. App'x ___, No. 13-11608, 2014 WL 1613206, at *7 (11th Cir. April 23, 2014); *see also* Kragor, 702 F.3d at 1310-11. Only offering speculations about Lawing's reasons for investigating the confrontation in the manner he did, Plaintiff has not provided evidence of a discriminatory motive.

Nor can the Court conclude that Cleaver-Brooks's proffered reasons for firing Plaintiff are unworthy of credence. The evidence from both of the disinterested witnesses to the confrontation between Marcum and Plaintiff is that the material handler drove the forklift unsafely. Furthermore, regardless of whether Plaintiff was actually insubordinate, the record is clear that both African American and Caucasian employees at Cleaver-Brooks perceived him as having attitude problems, both before and during the confrontation. (Hines Depo., p. 15; Robert Jackson Depo., pp. 20-21, 23, 26-27; Peek Depo., p. 15). Even subjective

perceptions of an employee's attitude may "serve[] as a legally sufficient reason for an adverse employment action." Raspanti, 266 F. App'x at 824. There is no basis for the Court to conclude that Cleaver-Brooks's account of Lawing's motives should not be believed.

Because Plaintiff has not shown that Cleaver-Brooks's proffered reasons for discharging him were pretexts for unlawful motives, his retaliation claim is dismissed.

## IV.   Conclusion

For the foregoing reasons, Cleaver-Brooks's Motion for Summary Judgment (Doc. 21) is granted, and this case is dismissed.

**SO ORDERED**, this the 14th day of June, 2014.

*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**

scr